With the court's permission, I'd like to focus principally on three of the issues, the exclusion of the post-litigation claim file, the judge's refusal to instruct the jury not to punish defendants for conduct that injured non-parties, and the excessiveness of the punitive damages. To begin with the post-litigation claim file, I think it is important to understand what the evidence was and why it was so important. The excluded evidence included reports by three independent doctors hired by Northwestern Mutual to evaluate Mr. Merrick. The comments on those reports made by two internal Northwestern Mutual medical personnel, the additional comments on those reports by defendants' medical consultants, Drs. Kusher and Kaplan, Northwestern Mutual's correspondence with Mr. Merrick informing him that it had concluded on the basis of these reports that he was not disabled from performing the principal duties of his occupation on a full-time basis, which was the standard under the Northwestern policy, and it's very similar to the one under ours. The normative data for the C-Mind test that Merrick had been administered by Dr. Sandman and Dr. Kusher's comments on that normative data. The standard of review with respect to this particular issue is abuse of discretion, is it not? Yes, Your Honor. And I will be getting to why the judge did abuse his discretion, if I may. Certainly. After explaining why it was so important that this be admitted. I think they do go somewhat hand-in-glove. When you get to the part where you're explaining the reason that the court abused its discretion, could you give me just a sort of chronological, step-by-step explanation of what happened? I went through the record, and I was quite confused. Yes, absolutely. I have a cheat sheet in my briefcase, but I forgot to pull it out. Just briefly, why was the evidence so important to our side? First, the reports of the three doctors retained by Northwestern Mutual strongly supported our conclusion that Merrick was not totally disabled. They, thus, were highly relevant to the jury's determination of whether defendants breached their contract with Merrick. And because, as the trial judge recognized, it was a very close case on liability, it could have tipped the balance. Second, the district court had already given carte blanche to Merrick's bad faith expert, Stephen Prater, to hold forth on the evils of human provident, and at the same time rejected our request for bifurcation, which would have deferred that presentation until after the jury had decided whether he was disabled or not. As a result, Merrick's counsel and Prater were able to prejudice the jury from the outset with a well-honed story of how provident had come up with a host of evil practices and then infected Paul Revere with them as soon as the merger was announced. Prater repeatedly cast the two defendants as renegades and said that no other company in the industry acted this way. And to give two specific examples of some of the practices that he excoriated, he talked about the use of biased IME doctors and the requirement of objective proof for subjective ailments. Now, the Northwestern Mutual documents would have shown that this other company that he had no beef with, it hired three different doctors that all reached the exact same conclusion as ours. So it would have helped refute the suggestion, the strong insinuation, that we had hired biased doctors. Similarly, one of the two denial letters issued by Northwestern Mutual expressly referred to the failure of Mr. Merrick to support his claim with objective evidence. So here, again, is another company that hasn't been tarred with this very, very dark brush that's acting in almost exactly the same way that we did. So it was highly relevant to the bad faith and punitive damages claims. Indeed, it was our best counter to his strategy of using Prater's testimony to persuade the jury that defendants are bad companies and therefore must have acted in bad faith in this case. Third, it was a foregone conclusion that the entire pre-litigation claim file would be admitted, and that file included Dr. Sandman's report, which opined on the basis of the C-MIND testing that Merrick was disabled. Without the normative data and Dr. Kusher's explanation of why that data showed the C-MIND testing to be undependable, the jury was left to assume that we simply ignored evidence that was favorable to Merrick, which was one of the very things that Prater had said these companies do, that he accused us of. Well, why wasn't that in the original file, this response? Because it came in post-litigation. We couldn't get the normative data without a subpoena, and that happened after litigation commenced. But the issue is how you dealt with this claim, right? Well, and that goes to the fourth reason it's relevant, is that Prater told the jury twice in well-rehearsed questions and answers with plaintiff's counsel that we had a continuing duty after litigation commenced to continue evaluating the claim. So all of this material came into our possession during litigation, and we dutifully gave it to our in-house consultants, and they evaluated all of it, and basically they said on the basis of this, nothing's changed. We think he's not disabled. And again, we were prevented from showing the jury that we were doing exactly what Prater said we should do. But instead, what the jury saw is this very misleading claims file that ends right when litigation begins, and they're left to wonder, well, why were we doing nothing for four or five years after litigation commenced? So now, if I may, I'll turn to the question you kindly allowed me to defer, which is, why was this an abuse of discretion? And basically what was going on here was there was a discovery dispute. This was standard, you know, standard litigation discovery where you say, okay, I'm putting in all of these objections, and then notwithstanding the objections, you turn everything over. And that's basically what happened. There was a privilege objection, but we repeatedly turned over whatever we had that was in the claim file. At the end of the process, when the magistrate judge held that the privilege was waived because of the lack of a privilege log, we had been saying repeatedly there's no privilege log because there's no documents that haven't been turned over. But you kept making this privilege objection, which I guess led the magistrate judge to assume that you were saying two inconsistent things? Well, a couple of points on that. Yes, the boilerplate did remain in for quite some time. But at the same time, there were many different discovery requests, not just the one that we're focused on, which was No. 4. It did stay in to No. 4, and the magistrate judge's ruling isn't specific to one or the other. It's across the board. But we had two officers of the court, Mr. McKinnon and Hess, repeatedly represent to the district court. The latter in a declaration filed under perjury, under the penalty of perjury, that there were no other documents. They said it over and over again. And if I may, I'll cite the courts of the ER. 492 to 493, 509 to 510, and 512. They also put it in filing after filing. So where you'll find it on pages 469, 470, 476, 482, 488 to 489. So then we find ourselves in front of the district court on the motion in limine, and during this time we're telling the judge there is nothing else. And nonetheless, the judge simply accepts the plaintiff's assertion, well, there are representations of two members of the bar who could lose their licenses if the judge determines that they're lying to him. And on the basis merely of the plaintiff's argument that there must be something more, notwithstanding that they had turned over several thousand pages, the judge says, I think this is unfair to the plaintiff. None of this is coming in. And I think in the context of how important the evidence was to our side and the plaintiff's argument that the plaintiff had simply let the plaintiff's expert run rampant, had refused our request to bifurcate the trial so it didn't pollute the contract determination, that to deprive us of this highly important evidence on the basis of the assertion of plaintiff's counsel that there must be something more, and in the face of the affirmative representations of our counsel, I think is an abuse of discretion. Kagan. So your representation to us here, then, is that this statement, this objection on the basis of privilege, that you were not producing privilege documents, which is in your papers, and which the magistrate judge kept pressing you on, that was an error, that was just erroneous boilerplate that you were unable to get out of your papers, but otherwise you had produced everything that was requested by the plaintiff, so there was no need for a privilege law? Well, the latter part is right, that we had produced everything. Whether it was an error, there were — I think it's discernible from the various filings that there was something else going on here, that Mr. — Mr. Hess and McKinnon understood the plaintiff's team to be seeking not just claims file information but also work product going to the handling of the litigation. And it appears to me from what I've seen in E.R. — and I don't have the site with me, but I'll supply it later — that their belief was that Mr. Friedman was seeking materials that went to the litigation strategy, not to the claims file issue. And that's why they kept leaving it in, and that's why McKesson said to the district judge that there's — that there were privileged conversations between client and counsel. I think that's what he was getting at. And then why didn't you — why wasn't a privilege law created for that material? Well, I guess what he finally concluded was that — that — well, he — I don't think he felt that that was what was waived by the — by the magistrate judge. I think what he felt was waived was just the stuff having to do with the claim file, and because there was nothing, he — he produced nothing. So the magistrate judge says all privileges are waived, and — and yet there was some work product that was not produced at that point after the magistrate judge made that statement? Well, I'm — I think anything having to do with how are we going to defend this case, I don't — I don't think we interpreted that to be what the magistrate deemed us to have waived. I mean, that would have been really remarkable holding, and I don't think that that was ever contemplated by the magistrate or by our counsel. I don't — certainly I don't think they turned over anything having to do with, you know, here's which witnesses we should call, you know, that sort of thing. And as I say, I don't think they interpreted it that broadly. But I think that's sort of what McKinnon was thinking about when he was telling the — the judge that there were conversations that were subject to the privilege, and the judge said, wasn't the privilege waived? And he said, no. That's my only way — that's the only way in which I can understand what he was saying, because they were so clear, both before and after that conversation he had with the judge, that they had turned over all of the claim file, that he had to be thinking about something else. Counsel, you're down below seven minutes. You might want to go on to your second argument. Did you propose to discuss the jury instruction on punitives? Yes, very much so. I think Philip Morris v. Williams makes clear that whenever there's a risk that the jury will seek to punish the defendant for harms to nonparties, the trial court must guard against that risk by giving a cautionary instruction. And we did ask for one, and the Court did refuse it. Now, Mr. Merrick makes several arguments in an effort to avoid the implication of Williams, and obviously there's not time to track through all of them here. I think the principle — there's several that I will address. Let me ask you a preliminary question. Are you familiar with a case that was argued just a week or two ago in this Court, White v. Ford Motor Company? Yes, I am, Your Honor. It also involves Nevada. Yes, I am, Your Honor. It is quite possible that the issues in that case are identical to the issues in this case. Are you able to inform us on that or not? Well, a very similar instruction was requested, and some of the same basic arguments are being made there. For example, the argument about, well, it was incomplete because you didn't tell the jury that they could use it to gauge reprehensibility, that's in both cases. So, you know, coordinating on that point is probably a good idea. All right. So you wouldn't have any objection if we were to defer submission at least as to that issue until we see what the other panel did? Because under our rules, the first panel to address the issue has priority. That would be fine, Your Honor. I am aware that the Court has suggested mediation. I don't know what the outcome of whether the parties will agree to that or not. Well, that's a separate matter. Yes, just in terms of the case. Mediation in the White case. Yes. And then there are also arguments in that case about whether there was any evidence that created the kind of risk that would warrant the instruction. And we have that same issue here, because the judge's principal reason here for refusing it was he said, I don't see evidence of harm to nonparties or conduct directed at nonparties. And, you know, I guess I would like to respond to that by reading the very first sentences out of Plaintiff's counsel's mouth in opening statements. He says, Good afternoon. Unum Provident Corporation is the largest disability insurance carrier in the country. And before this case is over, the eight of you are going to know more about how Unum Provident does business than any other eight people in Nevada. And with that knowledge will come a responsibility, a responsibility not just to judge how Mr. Merrick was treated by this insurance company, but the responsibility to pass judgment on corporate conduct that affected literally tens of thousands of people, tens of thousands of disabled people. That was their theme, and then they brought on Prater to deliver it home for hours on hours, talking about how evil the company is and how it's cheating its insurance rights right and left. So I think the principal basis for the judge's refusal to give the instruction is simply invalid. But it's okay for the jury to consider harm to others with respect to reprehensibility. Why wasn't that consideration of that prong of the Gore factors? Why wasn't it in the draft instruction? No. Why wasn't that just going to reprehensibility as opposed to the unconstitutional imposing penalties based on harm to others? You mean the statement of plaintiffs? Right. What the focus in Williams is on, is there a risk that the jury will confuse the two? The Court says that more than once. Without an instruction, we don't know how the jury is going to think it can use this evidence. There certainly was, you know, without a question from the Court, look, you can use it for this, but you can't use it for that, you know, the jury was left to its own devices. And this was a case, after all, in which liability was close. There was an awful lot of evidence that showed that Mr. Merrick passed physical test after physical test, had a very substantial IQ, all of those things that undermine his argument that he's functionally unable to perform his job duties. Counsel, you're down to about two minutes. You may wish to reserve or assume. Either way. If you're not going to let me have any extra, I will reserve. No. We stick to our time limit. Thank you, Your Honor. Good morning, Your Honors. Thomas Hudson on behalf of the plaintiff, Clinton Merrick. I guess in light of Mr. Tager's argument, I'll touch briefly on the evidentiary issues, and I don't really want to spend a lot of time on that unless the Court has questions. I think Judge O'Scanlan got it exactly right. It's an abuse of discretion. And there's sort of so many reasons why there's not an abuse of discretion, it's hard for me to know where to begin. First and foremost, the district court excluded the evidence that they're talking about here for many, many reasons, not just the magistrate's order. And we included some sites on pages 43 to 45 of our brief. I can provide more sites as well. A second reason, an equally strong reason, is that none of the documents that they're in the decision-making with respect to the claim. And I think, Judge O'Scanlan, you asked a question about that. And we say that because what came out is that this was discovery, it was handled by the lawyers, and there was no witness who could testify that it played any role in the decision-making. And they never did. Well, what about the continuing duty? You heard counsel suggest that, in effect, this is a continuing process and isn't frozen in time at the time of the filing of the complaint. I think that's correct, Your Honor, but that doesn't really help them in this case because, again, they had the evidence they're talking about here, there was no witness who could say it did affect their decision-making. It played no role whatsoever. And they never proffered any witness who could lay that foundation. In other words, the foundation for that predicate is missing. And, for example, you mentioned Mr. Prater. Well, they could have impeached Mr. Prater with this evidence had they chosen to do so, but they didn't. They did use other evidence from the so-called post-litigation file. And that sort of takes me to another point, which is that the district court really gave the district court ran a pretty tight ship in terms of the evidence with both sides, and the district court has the discretion to do that. But the district court also gave them a lot of flexibility in terms of how to admit this evidence. And, for example, some of the inlimited rulings, of course, the district court said that five times were preliminary, five times during the hearing, beginning of trial, well into trial, and modified those rulings as the course of the trial went on, and they just never took advantage of what the district court would allow them to do. And the real problem the district court had is that, again, there was no foundation for this document. The Northwestern claim file really dealt with a different claim, and the district court concluded this would be confusing to the jury and so on. But the transcript seems to suggest the district court was ruling based on a discovery sanction, and assuming that that was the case, what conduct on the part of the insurance company made the sanction not an abuse of discretion? How did the sanction make sense? Well, I think you have the order correct. Let me just note, there were other – the district court did give other grounds, and one, they are cited in our brief. Another, there also was explained at pages 86, line 15, through pages 92 of the 1115 transcript, where it's specifically addressing the motion limiting number 4. It has nothing to do with sanctions. But with respect to the sanctions issue, the chronology is important there. As you noted, Judge Akuta, I think you got it exactly right. The magistrate first said, don't invoke the privilege unless you're withholding documents. They did it again. Then he issued the order, and they again continued to assert the privilege after that order was issued. And this is detailed at pages 34 and 35 of our answering brief with the record cites, and it's also, if you take a look at CR 230, this chronology is detailed. And I think the important point is they never appealed the magistrate's order. I mean, once that – if they had a problem with what happened there, and now we've heard that maybe they thought they didn't have to produce documents, even though it said all privileges are waived, but they should have appealed the magistrate's order. It's improper to sort of collaterally attack it at this stage in the litigation. And we heard something about Mr. Sandman and the C-Mind data. They moved to exclude Mr. Sandman and his data from evidence, and the district court granted their motion. And that was CR 178. So it's puzzling to hear them complain on appeal that they should have been allowed to introduce Mr. Sandman's data when they moved to exclude him from testifying at trial. So unless the Court has further questions on the evidentiary issues, let's talk about the jury instruction issue. I'm not familiar with the specific issues in the White v. Ford case, but I am familiar with the instructions that were requested in this case and the instructions that were given in this case. And I gave the clerk and asked the clerk to give the panel a little handout of the requested instruction, because I thought it might be helpful for us in talking about it to have it in front of us. And I don't know if the Court has that or not. But the requested instruction began by saying, in deciding whether or in what amount to award punitive damages, you may consider only the specific conduct by defendants that injured plaintiff. And that instruction is flatly contrary to what the Supreme Court said was appropriate in the Williams v. Philip Morris case. In that case, as ---- Let me ask you, what am I looking at here? It says defendants proposed instruction number 32 offered by the insurers. What happened to this? I'm not going to say what happened to this. Was it given or not? This instruction was not given in this. This particular instruction, as written, was not given to the jury. And it would be helpful if you would compare what was not given with what was in fact given. Okay. I'll be happy to do that. Again, just to complete my first point, which I think is particularly significant given that it's never error to decline to give an erroneous instruction. And what was asked for here is erroneous. So it would have been error for the Court to give this instruction. But even if it's erroneous, I think the question is did the instructions that the Court gave, were they consistent with what's required by the Supreme Court to protect the insurance company's constitutional rights? Okay. And let me address that. But as a predicate, given that this, you know, this is a civil case and that parties have to submit written instructions under Rule 51, if a party submits an erroneous instruction, a court doesn't abuse its discretion by declining to give it. But let's talk about what was given and why it was appropriate. And to and to and to. So what's the relevance of this document? Why are you giving this to us? Well, it has to. That's the case. The point, Judge O'Scanlan, is that the instruction the defendants asked the Court to give and that we're considering here on appeal, and the question is did the Court the bottom line question is did the Court abuse its discretion in refusing to give Requested Instruction No. 32? And my point is the district court did not abuse its discretion in declining to give Instruction No. 32 because Instruction No. 32 is legally erroneous. Philip Morris makes that clear. But you heard Judge Okuda. We're interested in looking at the instruction as given to determine whether it was appropriate or not. And the point under Philip Morris is that the insurance company clearly requested protection. Exactly. But it was contemplated in the Philip Morris case. When that protection is requested, then the Court has to provide some curative instruction. Exactly. So let's talk about what was given. And just as, again, a predicate, the district court here kept out excluded evidence of other claims handling. If you turn to page 2 of the handout, this is the verdict form. But going back to the instructions itself, what the district court told the jury, first and foremost, is that the jury could only punish if the plaintiff, not others, suffered harm from the defendant's conduct. It emphasized that the punitive award must be based on the conduct upon which you base your finding of liability, which, of course, focused on specifically focused on defendant's handling of Mr. Merrick's claim. Then we get to the verdict form itself, which is on page 2 of the handout. And it says, and I've underlined the significant, the language that's significant, which is, did defendant Parveer act with oppression, fraud, or malice expressed or implied in its dealings with plaintiff, such as to justify an award of punitive damages? So the district court's instructions read as a whole, focused exclusively on the What is the status of the record with respect to consent of the insurance company as to this verdict form? Did they consent or was it issued under protest or under objection? That's a good question, Your Honor. And I'm, I, there was some discussion of the, of the verdict form itself. I think there are alternative verdict forms submitted. I don't think any specific objection was ultimately lodged against this, but I would need to check the record to confirm that. But the, but the real point is that the, what the jury was told in this case provided, focused the jury on the appropriate inquiry. And what Phil Moore says, it's important that the jury ask the right question, not the wrong question. And what the district court told the jury was to ask the right question, that for punishment, direct punishment, think about the defendant's dealings with the plaintiff. But, again, sort of the other, in Phil Moore's, you know, it slices the onion pretty thinly. It says that the jury may consider in assessing the defendant's reprehensibility conduct affecting other parties. So, again, the jury instructions in the verdict form here properly focused the jury on that. And I'd like to, I guess I take it from the Court's question that they're not so much concerned about whether this issue is properly preserved or whether an appropriate request was made, but just really whether the jury was given some, whether the district court gave the jury some protection. If I'm wrong about that, I have some other comments about why this really wasn't preserved. But going to the protections itself, let me emphasize, too, that Philip Morris specifically says that it's going to leave courts with a lot of flexibility in terms of how to implement the protection. And we also know that district courts have wide latitude in the wording they can use in the formulation of instructions. And I would submit that, you know, if this isn't enough, there's going to be a lot of, not just in civil cases, but criminal cases that are reversed if, you know, if the latitude we give courts in all kinds of cases suggests that this is more than appropriate. I'd be happy to answer any other questions on the instruction because I do sense the Court's concerned about it, but I think it's the protection was clearly given in this case. And, again, in our view, it wasn't properly preserved for a number of reasons. And do you want to speak to the attorneys' fees issue? I'd be happy to, Your Honor. And I'll be candid with you. In my view, that's the difficult issue in the case. I don't think the rest under existing precedent are particularly challenging. But let me explain to you why I think the district court got it right on that issue. It all depends on what fiscus means, right? It all depends on what fiscus means, Your Honor. And I think, you know, the difficulty is there's not a lot of analysis in fiscus. It says what it says. I think the strongest reason for affirming the district court's interpretation is footnote 3 of fiscus. And in footnote 3, the Court noted that the defendants in that case, like the defendants here, were arguing that there was a reasonable basis to deny the claim. And the Court said, well, given the jury's finding on bad faith liability, that's not going to count for much. And, you know, although obviously the parties disagree, the evidence, you know, the district court observed that the evidence was strong, and it was. There was no doctor that supported their decision to deny the claim. And they, you know, after they denied the claim, came up with a bunch of new reasons to try to defend it. So it's not particularly novel or surprising that in ultimately deciding whether to award attorney's fees, that the district court would look to the jury's findings on this. I don't think that's a particularly unusual thing for a district court to do. But district courts seem to think there was that fiscus created a per se categorical rule, which the insurance company says was a legal error because under Nevada law, you can't do that. I — it certainly, without fiscus, the district court would not have ruled the way it did, and that was made clear in the record. But, again, if you look at sort of the rationale of fiscus itself, the attorney's fee statutes begin — built into the statute is the directive to courts to interpret the statutes liberally. That's in the Nevada statutes themselves. And that's the statutes that fiscus was interpreting. And then you have the Nevada Supreme Court saying, well, we have a jury finding. That's equivalent to the predicate in the statute. Yeah, they're making arguments that they had a basis, but the jury rejected those. And, therefore, under the Nevada statute, I'm going to award fees. That's our best argument on that. I think it's the better reading of the — we submit it's the better reading of the case. But, you know, it's not the most clear decision on attorney's fees that I've ever read. Okay. Anything further, counsel? None, unless the Court has any questions on any of the other issues. No questions. Mr. Tager, you have some reserve time. I'll start with the instructional argument. And Mr. Hudson's assertion that the instruction was wrong, and that wasn't the basis for the judge's ruling, and that's clear from the record. And, also, I wanted to point out that we offered another instruction that didn't suffer from the problem he's asserting, which was number 31, which said, You're not to impose punishment for harms suffered by persons other than plaintiffs. Such individuals may bring their own lawsuits in which other juries can resolve those nonparties' claims, which was rather prescient. It's almost identical to what Philip Morris involved. So twice we went to the Court with instructions like that, and his basic response is there's no evidence of that. Well, remind us, what is the – what is wrong, from your point of view, with the instruction that was actually given? Oh. The instructions that were given applied to bad faith liability and punitive liability. They didn't go to the amount. Now, the prejudice, the risk, is that the jury will say, oh, okay, for deciding liability, we have to focus on the conduct that injured the plaintiff. But we don't have to do that for amount because the judge didn't tell us. So now we can go ahead and broaden it. Having crossed the threshold, we can punish them for everything. Turning to the evidentiary issue, the Court did make clear that its rulings were definitive, and I think he would have bit Mr. Hess's and McKinnon's head off if they had pushed it any further than they did. As far as not appealing the magistrate's order, that wasn't our beef. Our beef wasn't with the waiver of the privilege. Our beef was with the exclusion of the evidence. So I don't think that – I think that's a red herring. Sandman's file is in the claim file, Sandman's report. So even if he was excluded as a witness, the report was there for the jury to see. Finally, on Fiscus, I think take it in the context of the cases that were decided by the Nevada Supreme Court afterwards, which we cited in our brief. They all apply a Rule 11-like standard, and it can't be the case, in light of those later decisions, that the Court contemplates the per se rule that Your Honor, you know – What's your view of Fiscus? Fiscus footnote 3. I'm afraid I don't remember the content of the footnote, Your Honor. Well, I'm just giving you an opportunity to respond to counsel's report. But as I say, our point is that the subsequent cases make clear that the defense or the claim has to be based on something that's just – so I don't think that's unsupportable as to violate their equivalent of Rule 11. And clearly, our defense in this case came nowhere near that. But I hope you won't have to reach that issue because of the evidentiary one. All right. Thank you, counsel. The case just argued will be submitted for decision, and the Court will adjourn. Dearly, dearly. All courts and judges, I have a business to the Honorable United States Court of Appeals of the Ninth Circuit. I will now depart. For this Court, the session must dance adjourned. Thank you. Thank you. Thank you.
judges: Hall, O'scannlain, Ikuta